

The following constitutes the Memorandum Decision of the Court.  Signed: October 29, 2019

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re | Case No.09-47699 RLE |
| STEPHEN LAWRENCE STAPLEY AND NANCY CHRISTINE STAPLEY, | Chapter 7 |
| Debtors. | Adversary No. 18-4061 |
| STEPHEN LAWRENCE STAPLEY AND NANCY CHRISTINE STAPLEY | |
| Plaintiffs, | |
| v. | |
| STATE OF CALIFORNIA THROUGH ITS FRANCHISE TAX BOARD, | |
| Defendant. | |

MEMORANDUM DECISION ON

FRANCHISE TAX BOARD'S MOTION FOR SUMMARY JUDGMENT

# I.   Introduction

Plaintiffs' complaint in this adversary proceeding states two claims for relief against the Franchise Tax Board (the "FTB"). The first claim is based on Bankruptcy Code §505(a) and asks the court to find that plaintiffs owe nothing to the FTB on the theory that the tax debt is owed by S&N Holding Company, Inc. ("S&N"), a Subchapter S corporation which plaintiffs controlled at relevant times. The second claim is based on Bankruptcy Code §523(a)(1) and §523(a)(7) and asks the court to find that plaintiffs do not owe the penalties the FTB claims they owe because the penalties were discharged in plaintiffs' 2009 Chapter 7 case.

Before the court is the FTB's motion for summary judgment. The motion has been fully briefed and argued. Below are the court's reasons for granting it. The court finds that plaintiffs – not S&N – owe the tax debt to the FTB and the penalties plaintiffs owe on that tax debt were not discharged.

# II.  Legal Standard

## A.   Jurisdiction

The court has jurisdiction here pursuant to 28 U.S.C. §1334(b). This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(I) and (O). The court also has jurisdiction pursuant to Bankruptcy Code §505(a). <u>In re Mantz</u>, 343 F.3d 1207 (9th Cir. 2003).

B.  Summary Judgment Standard

Under Fed. R. Civ. Proc. 56(a), applicable here by Fed. R. Bankr. P. 7056, the court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Proc. 56(c)(1); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255.

If the nonmoving party's version of the facts, as a matter of law, does not entitle it to relief, that is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. Factual Background

Unless otherwise noted in the following discussion, the facts are undisputed.

### A.   The SC2 Transaction

In 2001, plaintiffs retained the public accounting firm KPMG, LLP for tax planning and guidance. Through KPMG, plaintiffs engaged in a transaction known as the Subchapter S Charitable Contribution Strategy (the "SC2 transaction") which was designed and sold by KPMG.[1]

The SC2 transaction involved the following steps: Plaintiffs formed S&N as a Subchapter S corporation. S&N issued 36,240 voting shares and 326,160 nonvoting shares to plaintiff Stephen Stapley. S&N also issued a warrant to Stephen Stapley giving him the right to purchase 3,261,600 shares of nonvoting stock (the "Warrant"). The Warrant recites that its exercise price is $0.80 per share which had been determined by an independent appraisal to represent 92.036% of the fair market value of each share of nonvoting common stock on June 4, 2001. *Stapley Dec., Ex. 2, ¶(c)*. Plaintiffs then "donated" the nonvoting shares to a tax-exempt entity known as the

---

[1] KPMG sold this SC2 transaction to approximately 58 other taxpayers and LAPF and one other tax-exempt entity participated in more than half of them. See MINORITY STAFF OF PERM. SUBCOMM. ON INVESTIGATIONS, STAFF OF COMM. ON GOV'T AFFAIRS, U.S. TAX SHELTER INDUSTRY: THE ROLE OF ACCOUNTANTS, LAWYERS, AND FINANCIAL PROFESSIONALS, FOUR KPMG CASE STUDIES: FLIP, OPIS, BLIPS, AND SC2. S. REP. NO. 108-34 (2003) at 74-76 (COMM. PRINT 2003).

City of Los Angeles Safety Members Pension Plan ("LAPF"). S&N and LAPF also entered into a Redemption Agreement pursuant to which, *inter alia*, S&N agreed to remain an S corporation and LAPF agreed to sell back to S&N the 326,160 donated shares at an agreed time and S&N agreed to pay the fair market value on the date the stock was presented for redemption.[2]

Through this structure, plaintiffs ostensibly owned ten percent of S&N and were allocated ten percent of its pass-through income. LAPF owned ninety percent of S&N, but because it was a tax-exempt entity, it paid no tax on the ninety percent of the income allocated to it. The Warrant served to ensure that LAPF would cooperate with S&N when it sought to redeem the shares LAPF held.

As part of the transaction, plaintiffs obtained a valuation of S&N in order to take a charitable contribution deduction of $283,000 in tax years 2001 and 2002 for the donation of the 326,160 shares to LAPF. *Porter Dec. Ex. B, p. 16*. The valuation obtained by plaintiffs set the S&N share value at $0.87 and the exercise price of the Warrant at $0.80. *Porter Dec. Ex. B, p. 37-38*.

---

[2] The Redemption Agreement is attached to the proof of claim filed by LAPF in plaintiffs' Chapter 7 case. The LAPF proof of claim indicates that S&N redeemed the stock in March 2007.

Plaintiffs also took deductions for the costs of setting up the SC2 transaction. *Porter Dec., Ex. B, p. 37.*

At all relevant times, S&N filed its federal and state tax returns as an S corporation and plaintiffs' tax returns for tax years 2001-2004 relied on the positions taken in their SC2 transaction. This is the basis for the FTB's position that plaintiffs underpaid income tax for the four tax years in issue.

B.    The IRS Examines Plaintiffs SC2 Transaction

In 2002, the IRS offered taxpayers who had participated in an SC2 transaction a chance to obtain a waiver of certain federal penalties if the taxpayer voluntarily disclosed the taxpayer's participation in the SC2 transaction. See Announcement 2002-2, I.R.B. 304. Plaintiffs apparently took advantage of this. *Porter Dec., Ex. B, p. 24.*

In April 2004, the IRS issued Notice 2004-30 in which it formally took the position that the SC2 transaction was a "listed transaction" which lacked economic substance and the transfer of the non-voting shares and the allocation of income to the tax-exempt entity would be disregarded. *FTB's Request for Judicial Notice, Ex. A, IRS Notice 2004-30, I.R.B. 2004-17.* Designating SC2 as a listed transaction notified taxpayers and their representatives that the claimed tax benefits purportedly generated by any SC2 transaction were not allowable for federal income tax purposes.

## C. The IRS Examination Report

At some point after April 2004, the IRS examined plaintiffs' and S&N's tax returns for tax years 2001-2004. In November 2006, the IRS sent plaintiffs its Examination Report for the tax years in question. *Porter Dec., Ex B*. The IRS identified five issues it had examined. The first issue was whether plaintiffs' transfer of the S&N stock to LAPF in the SC2 transaction would be disregarded for federal tax purposes such that plaintiffs would be treated as if there had been no transfer to the tax-exempt party. The second issue was whether the capital structure created in plaintiffs' SC2 transaction violated the single class of stock requirement for S corporations. The remaining issues were whether the fees and costs plaintiffs had paid were deductible, whether the charitable contribution deduction was proper, and whether plaintiffs were liable for an accuracy-related penalty due to engaging in the SC2 transaction.

As to the first issue, the IRS concluded that plaintiffs' transfer of the S&N stock to LAPF in their SC2 transaction should be disregarded under various judicial doctrines including the Substance Over Form Doctrine, the Economic Substance Doctrine, the Business Purpose Doctrine, and the Step Transaction Doctrine.

In its discussion of the Substance Over Form Doctrine, the IRS stated that it was axiomatic that the substance of a transaction, rather than its form, governed for federal tax

treatment, citing <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935); <u>Frank Lyon Co. U.S.</u>, 435 U.S. 561 (1978); <u>Rice's Toyota World, Inc. v. Comm'r</u>, 752 F.2d 89 (4th Cir. 1985). To determine whether the true substance of a transaction differs from its form entails an analysis of the facts. Here, the IRS stated that even though the individual pieces of the SC2 transaction literally complied with the Tax Code, it was an "abusive transaction" that produced results other than what the Tax Code and regulations intended. It was a "sham" transaction undertaken solely for the purpose of tax reduction and had no economic or commercial objective. *Porter Dec., Ex. B, p. 25-27*. Accordingly, the transaction was without effect for federal income tax purposes.

In its discussion of the Economic Substance Doctrine, the IRS stated that a transaction must have economic substance separate and distinct from the economic benefit achieved solely from tax reduction, citing <u>U.S. v. Wexler</u>, 31 F.3d 117, 122 (3rd Cir. 1994); <u>Yosha v. Comm'r</u>, 861 F.2d 494 (7th Cir. 1988); Goldstein v. Comm'r, 364 F.2d 734 (2d Cir. 1966). *Porter Dec., Ex. B, p. 29-30*.

Here, the IRS concluded that plaintiffs were the true owners of all of S&N and LAPF merely appeared to be a shareholder during the time the S&N shares were "parked" with it. The facts relied on by the IRS included the following: (1) S&N was not going to make any distribution to LAPF other than under the Redemption Agreement, *i.e.*, LAPF would only receive the amounts it was paid to extend

the time period for redemption which was ultimately $151,300; (2) LAPF did not possess any meaningful benefits or burdens of stock ownership because it was not impacted by increases or decreases in the value of the S&N stock commensurate with its purported ownership interest; (3) LAPF was guaranteed a purchase price under the Redemption Agreement based on the fair market value on the date of redemption; even if the stock then had zero value, the LAPF would never incur any losses; and (4) even though ninety percent of S&N's income was allocated to LAPF, the transaction was structured so that plaintiffs could exercise the Warrant to dilute the number of shares held by LAPF, or the mere existence of the Warrant enabled plaintiffs to purchase the shares from LAPF at a reduced price. In short, even though the transaction literally complied with the Tax Code, it had no economic substance separate from the tax benefits to plaintiffs. *Porter Dec., Ex. B, p. 29-30*.

In addition, plaintiff Mr. Stapley had admitted to the IRS that his goal in entering into the SC2 transaction was to "defer taxes" and to "retain earnings" and the donation to LAPF was a "by-product" of these goals. *Porter Dec., Ex. B, p. 30*. The IRS also pointed out that plaintiffs had paid $550,000 to KPMG to set up the SC2 transaction and these costs far outweighed any "possible nontax purpose." *Porter Dec., Ex. B, p. 30*.

Under its analysis of the Business Purpose Doctrine, the IRS said Mr. Stapley claimed the nontax business purpose of the transaction was to provide a way to build up the internal working capital needs of S&N. *Porter Dec., Ex. B, p. 32*. The IRS concluded that this stated nontax business purpose and the means chosen to accomplish it failed the business purpose test. It stated the "restructuring of the S corporation and the issuance and purported transfer of the nonvoting stock has no nontax purpose." The IRS here cited <u>Cherin v. Comm'r</u>, 89 T.C. 986 (1987); <u>ACM Partnership v. Comm'r</u>, 157 F.3d 231 (3rd Cir. 1998); <u>Yosha v. Comm'r</u>, 861 F.2d 494 (7th Cir. 1988). *Porter Dec., Ex. B, p. 32*.

The IRS also discussed the Step Transaction Doctrine, characterizing it as an application of the Substance Over Form Doctrine. This test allows the IRS to treat formally separate steps as one transaction for tax purposes if the steps are part of a single scheme or plan intended at the outset to achieve a specific result, citing <u>King Enterprises, Inc. v. U.S.</u>, 418 F.2d 511 (Ct. Cl. 1969); <u>Andantech v. Comm'r</u>, T.C. Memo 2002-97. *Porter Dec., Ex. B, p. 34*. Applying this test, the IRS concluded that the transfer of nonvoting shares to LAPF would be disregarded. At the end of the transaction, LAPF was to be paid cash and so had acted as an accommodation party in an abusive tax shelter. As such, plaintiffs' charitable deduction would not be allowed, plaintiffs would be treated as the owner of the nonvoting stock and their

deductions for the legal fees, professional expenses, and payments to LAPF would be disallowed. *Porter Dec., Ex. B, p. 34.*

As to the second issue, the IRS analyzed whether S&N's capital structure created a second class of stock in violation of 26 U.S.C. §1361(b)(1)(d) and Treas. Reg. §1-1361-1(*l*). *Porter Dec., Ex. B, p. 36.* Except as provided in Treas. Reg. §1.1361-1(*l*)(4), a corporation is treated as having only one class of stock if all its outstanding shares confer identical rights to distributions and liquidation proceeds. Treas. Reg. §1.1361-1(*l*)(1). Treasury Regulation §1.1361-1(4)(iii)(A) provides that a warrant will be treated as a second class of stock if, taking into account all of the facts and circumstances, the warrant is substantially certain to be exercised and has a strike price substantially below the fair market value of the underlying stock on the date it is issued.

The IRS concluded that the Warrant would be treated as substantially certain to be exercised because the holder of the Warrant would be economically compelled to exercise it if LAPF did not redeem its stock according to the terms of the Redemption Agreement. *Porter Dec., Ex. B, p. 36-39.*

Treasury Regulation §1.1361-1(4)(iii)(C) provides that a warrant will *not* be treated as a second class of stock if it has a strike price that is at least ninety percent of the fair market value of the underlying stock on the date the warrant is issued. The IRS concluded that this safe harbor did not apply to the

Warrant. The IRS asserted that the strike price was not at least 90 percent of the fair market value of the underlying stock (*i.e.*, the Warrant stock) because the appraisal done for plaintiffs by KPMG in 2001 had valued only the 362,400 outstanding shares of voting and nonvoting stock rather than these outstanding shares *plus* the 3,261,600 shares that would be issued if the Warrant were exercised. *Porter Dec., Ex. B, p. 36-39.*

Under Treas. Reg. §1.1361-1(*l*)(2)(iii), a redemption agreement may be disregarded in determining whether a corporation's outstanding shares confer identical rights to distribution or liquidation unless (1) a principal purpose is to circumvent the one class of stock requirement; and (2) the agreement establishes a purchase price that is significantly in excess of or below the fair market value of the stock. The IRS took the position that the effect of the Redemption Agreement in plaintiffs' SC2 transaction was to ensure that the exempt party would never receive distribution or liquidation proceeds commensurate with its purported 90 percent ownership interest and the purchase price of the shares was substantially below what would be expected for the fair market value of a ninety percent ownership interest of the S corporation. *Porter Dec., Ex. B, p. 36-39.*

As to the remaining issues, the IRS concluded that there was no charitable intent in the transfer of stock to LAPF so the charitable deduction should be disallowed. It also concluded that

the promoter's fees, accounting fees, legal fees, and redemption payments were not deductible under 26 U.S.C. §162, §165, or §212 by S&N or plaintiffs. *Porter Dec., Ex. B, p. 40-44.*

D.   The IRS Issues its Notices of Deficiency

In April 2008, the IRS issued Notices of Deficiency for tax years 2001-2004. The Notices stated plaintiffs owed approximately $4 million for these four tax years based on the conclusions reached in its Examination Report. *Porter Dec., Ex. B, p. 22-37.*[3]

E.   Plaintiffs File Bankruptcy

In August 2009, plaintiffs filed their Chapter 7 case. The court takes judicial notice of the following from the docket and the claims register: (1) the IRS filed a proof of claim stating it had a $394,547 secured claim for tax years 2001 and 2002 and a $5,422,764 unsecured claim of for tax years 2002-2004 all of which had been assessed on September 15, 2008; (2) LAPF also filed a proof of claim for $472,072 based on the failure to fully pay the $840,000 agreed upon redemption price for the S&N stock; and (3) plaintiffs received their discharge in December 2009 and the case was closed. According to plaintiffs, their debt to the IRS was discharged in their Chapter 7 case.

---

[3] The IRS also issued Notices of Deficiency to S&N. *Porter Dec., Ex. B, p. 38.* These were apparently never acted upon. *Russ Dec., Ex. H.*

F.    <u>The FTB Audits Plaintiffs' Returns</u>

The IRS reported its audit conclusions to the FTB as required by 26 U.S.C. §6103(d). In September 2010, the FTB sent plaintiffs its Audit Issue Presentation Sheet containing the FTB's response to the information it had received from the IRS. *Allair Dec., Ex C.*[4]

The FTB followed the IRS's reassessment of plaintiffs' tax liabilities to the extent the federal determinations matched California tax law. *Allair Dec., Ex. C, p. 2*. The FTB assessed a noneconomic substance transaction penalty (the "NEST Penalty") under Cal. Rev. & Tax. Code §19774 for each tax year in question because the SC2 transaction had no economic substance outside of the tax savings and served no nontax purpose of either S&N or plaintiffs as the original shareholders of S&N. *Allair Dec., Ex. C, p. 12-16*.

The FTB also assessed an interest-based penalty under Cal. Rev. & Tax. Code §19777 (the "IB Penalty") for each tax year in question because the SC2 transaction was a potentially abusive tax

_____

[4] <u>See</u> Title 18 California Code of Regulations §19032(b)(F). The Audit Issue Presentation Sheet tells the taxpayer the proposed audit adjustments, explains the facts, law, analysis, and the auditor's tentative conclusions. The taxpayer is asked to provide a response and is given an opportunity to provide additional information to rebut the auditor's conclusions.

shelter.[5] *Allair Dec., Ex. C, p. 16-18*. The FTB advised plaintiffs that it planned to issue Notices of Proposed Assessment for tax years 2001-2004.

G.    The FTB Issues Notices of Proposed Assessments

As it had indicated at the conclusion of its audit in September 2010, in October 2010, the FTB issued a Notice of Proposed Assessment for each tax year. *Allair Dec., Ex. D.*

H.    Plaintiffs' Protest with the FTB

Plaintiffs timely filed their protest with the FTB (the "Protest Letter"). *Allair Dec., Ex. E*. Plaintiffs acknowledged that they had participated in the SC2 transaction and acknowledged that the IRS had sent Notices of Deficiency in April 2008. *Allair Dec., Ex. E, p. 3.*

In response to the argument that the transfer of nonvoting shares to LAPF was a sham, plaintiffs asserted that the transfer to LAPF was a legitimate transaction with economic substance and the judicial doctrines of relied on by the IRS were not applicable. As such, they claimed their allocation of income to LAPF was

_____

[5] Cal. Rev. & Tax. Code §19777(a) provided: "If a taxpayer has been contacted by the Franchise Tax Board regarding the use of a potentially abusive tax shelter, and has a deficiency, there shall be added to the tax an amount equal to 100 percent of the interest payable under §19101 for the period beginning on the last date prescribed by law for the payment of that tax … and ending on the date the notice of proposed assessment is mailed." Section 19777(b) defined "a potentially abusive tax shelter" with reference to applicable federal definitions.

correct. *Allair Dec., Ex. E, p. 7-8.* In response to the IRS's alternative position that the Warrant created a second class of stock, plaintiffs argued that the Warrant did not create a second class of stock because the Warrant was *not* substantially certain to be exercised. *Allair Dec., Ex. E, p. 5.*

Plaintiffs also argued that they were entitled to a charitable contribution deduction and a business expense deduction for the SC2 transaction and the penalties were not appropriate or should be abated. *Allair Dec., Ex. E, p. 8-20.*

The Protest Letter concluded by requesting a hearing a stay of collection activity pending a final federal determination and the outcome of a case then pending in the District Court regarding another SC2 transaction engaged in by other taxpayers.[6]

I.   The FTB's Protest Determination

In May 2017, the FTB held a hearing on plaintiffs' protest. In November 2017, the FTB issued its Protest Determination Letter. *Allair Dec., Ex. F.* The FTB repeated its conclusion that the SC2 transaction was unequivocally identified as an abusive tax avoidance transaction in IRS Notice 2004-30 and it lacked economic substance and a business purpose. As such, S&N's income was properly allocated to plaintiffs, not LAPF. *Allair Dec., Ex. F, p.*

_____

[6] See Santa Clara Valley Housing Group, Inc. v. U.S., Case No. 08-05097.

*3.* The FTB agreed with the IRS's use of judicial doctrines to reallocate income from LAPF to plaintiffs. This meant the second class of stock issue was irrelevant. In short, the FTB concluded that plaintiffs had failed to carry their burden of proof to show that the SC2 transaction had economic substance, that the IRS was wrong, and the FTB should not follow the IRS. *Allair Dec., Ex. F, p. 11.*

Between the time of their 2010 Protest Letter and their 2017 hearing before the FTB, plaintiffs apparently changed their position on whether the Warrant created a second class of stock. In their 2010 Protest Letter, they strenuously argued that it did not. In 2017, they argued that the Warrant *did* create a second class of stock such that S&N's status as an S corporation terminated in 2001 and therefore S&N was the taxpayer that FTB should be looking to for payment. *Allair Dec., Ex. F, p. 9.*

The FTB rejected this argument for several reasons. First, there had been no final determination on this issue in the District Court case plaintiffs referred to in their Protest Letter. Second, pursuant to Cal. Rev. & Tax. Code §23801(a), a corporation that makes a federal election to be an S corporation is treated as one for California tax purposes and S&N had maintained its existence as an S corporation for the tax years in question. Third, citing Herrington v. Comm'r, the FTB determined that the duty of consistency prevented plaintiffs from changing their position on

the Warrant issue after the statute of limitations had run. Herrington v. Comm'r, 854 F.2d 755, 757 (5th Cir. 1988) (describing a form of estoppel, listing elements as a representation by the taxpayer, on which taxing authority has relied, and an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize it in such a way as to harm the government). *Allair Dec., Ex. F, p. 10*.[7]

The FTB also determined that the NEST penalty was discharged in plaintiffs' chapter 7 case, but the IB Penalty was not discharged.

J.    The FTB Issues Notices of Action

On February 20, 2018, the FTB issued a Notice of Action for each tax year in issue. *Allair Dec., Ex. G.* These Notices provided plaintiffs a deadline of March 22, 2018 to appeal. Instead, plaintiffs returned to this court to file this adversary proceeding on March 27, 2018.

**IV. Discussion**

---

[7] The Ninth Circuit has also approved application of this doctrine, characterizing it as a form of judicial estoppel. See Estate of Ashman v. C.I.R., 231 F.3d 541, 543 (9th Cir. 2000) (collecting cases, noting that "the duty of consistency not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law. The law should not be such a idiot that it cannot prevent a taxpayer from changing the historical facts from year to year in order to escape a fair share of the burdens of maintaining our government. Our tax system depends upon self-assessment and honesty, rather than upon hiding of the pea or forgetful tergiversation.")

## A. The FTB's Summary Judgment Argument

The FTB asserts that there are no triable issues of fact as to two issues. First, the FTB asks the court to determine that the amounts it assessed for tax, penalties, and interest for tax years 2001-2004 is correct. The FTB points out that plaintiffs have not challenged these calculations. Second, the FTB asks the court to determine that plaintiffs owe this tax debt and the discharge entered in plaintiffs' 2009 Chapter 7 case did not discharge these tax liabilities, the accrued interest, or the IB Penalties.

## B. Plaintiffs' Summary Judgment Argument

Plaintiffs contend there are triable issues of fact concerning whether they had a nontax business purpose for entering into the SC2 transaction. For this, they offer the declaration of plaintiff Stephen Stapley regarding his ostensible motive for engaging in the SC2 transaction.

Plaintiffs also contend that there are triable issues of fact concerning whether the Warrant constituted a second class of stock. For this, they offer the declaration of an expert opining that the Warrant was "deep in the money" and "substantially certain to be exercised" when it was issued despite KPMG's contrary assurances and plaintiffs' own previous arguments to the IRS and the FTB. Finally, plaintiffs contend the IB Penalty sought by the FTB was discharged in their 2009 Chapter 7 case.

C.  <u>Burden of Proof for Tax Proceedings</u>

Plaintiffs had the burden of proof in their response to the IRS's audit and in their protest with the FTB. In the context of litigation with the IRS, the IRS's determination that a transaction is a sham is presumptively correct, and taxpayers have the burden of producing evidence to rebut a deficiency determination and the burden of persuasion to substantiate their deductions. <u>Casebeer v. C.I.R.</u>, 909 F.2d 1360, 1362, n. 7 (9th Cir. 1990); <u>Valley Title Co. v. C.I.R.</u>, 559 F.2d 1139, 1141 (9th Cir. 1977). The court recognizes that plaintiffs did not pursue litigation with the IRS and that the initial presumption in favor of the IRS is a procedural device. Nonetheless, in 2004, the IRS notified *all* taxpayers that *all* SC2 transactions were shams. The record in this case, including the IRS proof of claim itself, shows that plaintiffs failed to convince the IRS otherwise as to their income tax returns by which they avoided responsibility for ninety percent of S&N's income in reliance on their SC2 transaction.

The FTB's determinations are also presumed to be correct and a taxpayer has the burden of proving such determinations are erroneous. Cal. Rev. & Tax. Code §18622(a); <u>Todd v. McColgan</u>, 89 Cal.App.2d 509, 514 (1940); <u>Appeal of Magidow</u>, 82-SBE-274, Nov. 17, 1982 (unsupported assertions are not sufficient to satisfy appellant's burden of proof with respect to assessment based on a federal action); <u>Appeal of Seltzer</u>, 80-SBE-154, Nov. 18, 1980 (in

the absence of credible, uncontradicted, competent, and relevant evidence showing that the determinations are incorrect, such determinations must be upheld). Plaintiffs had every opportunity to convince the FTB that its conclusions, based on in large part on the federal determinations, were erroneous. They failed to do so in the context of their protest. Plaintiffs returned to this court seeking what is, in effect, a redetermination of the previous conclusions reached by the taxing authorities. While it now appears to be well-trod ground, the burden of proof remains with plaintiffs.

D.   The Economic Substance Doctrine

As a general matter, transactions that are shams, or without economic substance, will not be recognized under the Internal Revenue Code or the California Revenue and Taxation Code. This principle originates in the Supreme Court's holding in <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935). In <u>Gregory</u>, the Supreme Court held that the taxpayer's corporate reorganization would be disregarded for tax purposes, even though it technically complied with the Tax Code because it was not the "the thing which the statute intended." <u>Id.</u> at 469. The Court examined only the transaction on its face, not the motives of the taxpayer. It concluded that the reorganization had no business purpose and the sham transaction should be entirely disregarded for tax purposes. <u>Id.</u> at 470. Under

*Gregory*, the court must determine the tax consequences of a series of transactions based on what "actually occurred." <u>Id.</u> at 469.

In <u>Frank Lyon Co. v. U.S.</u>, 435 U.S. 561 (1978) the Supreme Court explained the factors that guide the court's analysis regarding when it is appropriate to disregard the form of a transaction. The question is whether "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." <u>Id.</u> at 583-84.

The Ninth Circuit has interpreted <u>Frank Lyon</u> as requiring courts to consider both subjective and objective factors in characterizing a transaction for tax purposes. <u>Casebeer v. Comm'r</u>, 909 F.2d 1360, 1362-63 (9th Cir. 1990) (citing <u>Bail Bonds by Marvin Nelson, Inc. v. Comm'r</u>, 820 F.2d 1543, 1549 (9th Cir. 1987)). This has been phrased as a two-part test for determining whether a transaction is a sham: (1) has the taxpayer shown that it had a business purpose other than tax avoidance (a subjective analysis); and (2) has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits (an objective analysis). <u>Casebeer</u>, 909 F.2d at 1363; <u>Slone v. Comm'r</u>, 810 F.3d 599, 606 (9th Cir. 2015) (use a common sense review to determine the underlying economic substance for tax purposes); <u>Reddam v.</u>

Comm'r, 755 F.3d 1051, 1059 (9th Cir. 2014) (economic substance doctrine does not employ a rigid two-step analysis, subjective aspect considers whether taxpayer intended to do anything other than acquire tax deductions, objective aspect considers whether transaction had any economic substance other than creation of tax benefits).

The FTB is not required to prove that the transaction lacked *both* objective economic substance and a subjective business purpose; a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance. Shasta Strategic Investment Fund, LLC v. U.S., 2014 WL 3852416, *9 (N.D. Cal. July 31, 2014) (citing Coltec Indus., Inc. v. U.S., 454 F.3d 1340, 1355 n.14 (Fed. Cir. 2006)).

1.   *The Subjective Business Motivation Inquiry*

Stephen Stapley explains that before forming S&N in 2001, he owned a fifty percent interest in three limited liability companies engaged in the home building business. He transferred forty-nine percent of his interest in each one to S&N and kept one percent. He says the business purpose of this transfer was to consolidate investments under one corporate umbrella to "facilitate management and capital raising." *Stapley Dec., ¶9*. Stephen Stapley also claims he had a business purpose in partnering with LAPF: He wanted to

convince LAPF to invest in future home building projects which it ultimately declined to do. *Stapley Dec., ¶10-11*.[8]

Plaintiffs also argue that there was a business purpose for the Warrant, claiming Mr. Stapley testified that the Warrant was a vehicle for additional capital investment by the Stapleys. See *Plaintiffs' Opposition, p. 1:23-24, p. 13:24-25, p. 17:10-11*. However, his declaration is silent on this point and nothing in the current record shows when or where he so testified. Aside from that, it is a nonsensical argument as plaintiffs owned all the voting shares of S&N and could simply have invested in it as they saw fit without the Warrant.

Viewed in isolation, there may have been a credible nontax business purpose for forming S&N as an S corporation and transferring the limited liability company interests to S&N. But the formation of the S corporation was only one part of the SC2 transaction. The crucial piece of the SC2 transaction was the donation of the nonvoting shares to LAPF. This had no nontax business purpose; there was in fact no "partnering" with LAPF for any legitimate business reason. There was in fact only a temporary arrangement by which LAPF took on the appearance of the owner of

---

[8] These are the same facts used to support the arguments made to - and rejected by - the IRS and the FTB in plaintiffs' earlier skirmishes with the taxing authorities.

ninety percent of the nonvoting shares of S&N through what was a disguised charitable donation.

Under Cal. Rev. & Tax. Code §18622, the IRS deficiency determination is considered controlling and plaintiffs "shall concede the accuracy" of the federal determination or show how it is "erroneous." Plaintiffs failed to convince the FTB that the federal determination was erroneous and that their SC2 transaction did in fact have economic substance.

Taking Mr. Stapley's statements as true and drawing all reasonable inferences in plaintiffs' favor, his self-serving statements of a professed subjective intent to engage in a transaction with a legitimate business purpose is insufficient to overcome the FTB's evidence that no rational investor would pursue this SC2 strategy for any business reason other than tax avoidance. Plaintiffs fail to raise triable issues of fact as to a legitimate business purpose under the subjective prong of the economic substance analysis. If there are any questions regarding Mr. Stapley's subjective intent, they are insufficient "to affect the outcome of this suit" and they fail to defeat the FTB's motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

   2.  *The Objective Economic Substance Inquiry*

From an objective standpoint, the SC2 transaction was entirely irrational. It was unnecessarily expensive in that

plaintiffs paid KPMG $550,000 to set it up. If plaintiffs wanted an S corporation in order to have the pass-through income this provided, they could have formed one and stopped there. If plaintiffs wanted an entity to act as an "umbrella" for the ownership of their interests in the three limited liability companies' transferred to S&N, they could have transferred them and stopped there. If they wanted to make a charitable donation to a tax-exempt entity, they could have done this with cash and claimed a charitable contribution deduction.

Plaintiffs went further which shows the transaction was irrational. On paper, they held ten percent of the stock of S&N which was one hundred percent of its voting stock. They thus maintained complete control over S&N and how its income was spent or not spent. But they allocated ninety percent of this income to LAPF where it was exempt from taxation. They also maintained control over LAPF's temporary ownership of the stock they had donated to LAPF through the Redemption Agreement and the Warrant. If LAPF did not cooperate in the redemption piece of the transaction, plaintiffs could exercise the Warrant which – like a poison pill – diluted the value of LAPF's shares and ensured its cooperation.

In addition, where a transaction involves multiple steps, as the SC2 transaction did, when evaluating economic substance, the focus is on the specific pieces whose tax consequences are in

dispute. <u>Black & Decker Corp. v. U.S.</u>, 436 F.3d 431, 441 (4th Cir. 2006). Here, that key piece was the transfer of the nonvoting shares to LAPF, and the main question is whether that transfer should be respected for tax purposes. Both the IRS and the FTB found it should not be. While the form of the transaction suggested that LAPF was a ninety percent shareholder, it did not bear a commensurate risk or benefit which is how the SC2 transaction was designed. *Allair Dec., Ex. C, p. 12; Porter Dec. Ex. B, p. 28-29* (noting that S&N board minutes stated that the purpose was to park the shares at LAPF while S&N made no distributions and then reacquired them). The other key piece was the Warrant. It too lacked any economic substance and plaintiffs claim to the contrary lacks merit. It will not be respected for tax purposes in the way plaintiffs now argue.

Plaintiffs fail to raise a triable issue of fact regarding the economic substance of the SC2 transaction. It was a sham transaction. Accordingly, plaintiffs do not defeat summary judgment for the FTB.

E.    <u>The Step Transaction Doctrine and the Warrant</u>

The SC2 transaction involved several related parts, each of which was integral to its success as a tax avoidance tool. One of these pieces was S&N's issuance of the Warrant to purchase 3,261,000 shares of S&N stock. The Warrant enabled plaintiffs to compel LAPF to cooperate in the redemption piece of the

transaction, should that have been necessary. It also enabled plaintiffs to maintain control over the value of LAPF's nonvoting stock because they could dilute the value of what LAPF held if that had been necessary.

Because S corporations may only have one class of stock, the fact that the SC2 transaction involved issuance of a warrant apparently raised some initial concern. KPMG told plaintiffs there were certain risks involved in the SC2 transaction, including a finding that there was second class of stock if the IRS or other taxing authority attacked the transaction. *Porter Dec., Ex. B, p. 4.* However, KPMG advised plaintiffs that "the taxpayer would prevail (70% or greater probability of success) if the IRS should raise the second class of stock issue." *Porter Dec., Ex. B, p. 5.*

The IRS's November 2006 Examination Report took the alternative position that the capital structure created in the SC2 transaction violated the single class of stock requirement of 26 U.S.C. §1361(b)(1)(d) and Treas. Reg. §1.1361-1(*1*) causing the S election to be immediately terminated in 2001. The IRS also took the position that the safe harbor provisions in Treas. Reg. §1.1361(1)(4)(iii)(C) and (A) were not available to plaintiffs. Plaintiffs now seize on this alternative position discussed by the IRS even though the IRS never made it a final determination and plaintiffs once strenuously opposed it. Plaintiffs now claim to

raise triable issues of fact on this question based on their expert's valuation of the S&N stock.

Under applicable Treasury Regulations, a warrant is treated as a second class of stock if, taking all the facts and circumstances into account, it is substantially certain to be exercised, and has a strike price that is substantially below the fair market value of the underlying stock on the date a warrant is issued. Treas. Reg. §1.1361-1(*l*)(4)(iii)(A). The point of the test is to determine whether a warrant is "in the money" when it is issued.

Under Treas. Reg. §1.1361-1(*l*)(4)(iii)(C), there is a safe harbor test that compares the exercise price of a warrant to the value of the underlying stock on the date a warrant is issued. If the exercise price is at least 90 percent of the fair market value of the underlying stock on that date, there will be no second class of stock created.

When plaintiffs entered into the SC2 transaction, they obtained a valuation of S&N's shares in order to establish the amount of the charitable contribution deduction they took for the donation of 326,160 shares to LAPF. This established a value of .87 per share. *Porter Dec., Ex. B, p. 36-38.* Presumably, this valuation was aimed at keeping plaintiffs inside the safe harbor available under Treas. Reg. §1.1361-1(4)(iii)(C) because the strike price of .80/share was at least ninety percent of the fair

market value of the underlying stock (.87/share) on the date it was issued.

Plaintiffs now argue that neither the IRS nor the FTB analyzed the Warrant, focusing instead on the donation of the nonvoting stock to LAPF and finding it was a sham. Plaintiffs contend that their expert's valuation of the S&N stock shows that the Warrant was substantially certain to be exercised because it had a strike price of .80/share and each S&N share had a fair market value of $1.26 instead of .87 as the initial KPMG valuation had determined. *Luckenbach Dec., Ex. A.*

Plaintiffs make this argument with an apparent straight face even though: (1) KPMG told them there was a low risk that the IRS would succeed if it claimed the Warrant created a second class of stock; (2) the IRS never finally acted upon this alternative theory as shown by the proof of claim it filed in plaintiffs' Chapter 7 case and the IRS account transcript for S&N (*Russ Dec., Ex. H*); (3) S&N's Redemption Agreement with LAPF promises that S&N will remain an S corporation; (4) plaintiffs' federal and state tax returns treated S&N as an S corporation for all relevant years; and (5) plaintiffs strenuously argued against any such finding in their 2010 Protest Letter to the FTB.

Plaintiffs' belated reversal on this issue is troubling but it is ultimately irrelevant and any purported facts they try to raise now do not defeat summary judgment. The SC2 transaction

itself was a sham and the discrete piece of it involving the issuance of the Warrant will be disregarded for tax purposes. It is immaterial that plaintiffs now claim the Warrant was "deep in the money" or "substantially certain" to be exercised.

Plaintiffs' reliance on <u>Rice's Toyota World, Inc. v. Comm'r</u>, 752 F.2d 89 (4th Cir. 1985) and <u>Bail Bonds by Marvin Nelson, Inc.</u> <u>v. Comm'r</u>, 820 F.2d 1543 (9th Cir. 1987) is misplaced. These cases say a sham transaction *may* contain elements that have economic substance and these elements may be respected for tax purposes. These cases do not say the presence of such an element will inoculate the entire transaction nor do they say that all steps of a multi-step transaction must have economic substance to be respected for tax purposes. In fact, in their opposition to the FTB's motion, plaintiffs essentially concede that the donation to LAPF lacked economic substance. The issuance of the Warrant was integrally related to that donation as it was designed to ensure the donation was temporary. As such, it had no independent economic substance.

Application of the Step Transaction Doctrine here is entirely appropriate. As explained in <u>King Enterprises, Inc. v. U.S.</u>, 418 F.2d 511, 516 (Ct. Cl. 1969), there is no universal test applicable to step transaction situations, but the essence of the Step Transaction Doctrine is that an integrated transaction must not be broken into independent steps or, conversely, that the separate

steps must be taken together in attaching tax consequences. The purpose of the Step Transaction Doctrine is to assure that the tax consequences turn on the *substance* of a transaction rather than on its form. Id. at 517.

King further explains that courts have developed two basic tests for applying the Step Transaction Doctrine. Id. at 516. The "interdependence test" asks whether a reasonable interpretation of objective facts shows that the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. Id. The "end result test" looks at whether purportedly separate transactions will be amalgamated into a single transaction when it appears that they were in fact component parts of a single transaction intended from the outset to be taken to reach the ultimate result. Id.

Both tests apply here. The SC2 transaction was designed to allow plaintiffs to allocate ninety percent of S&N's income to LAPF and thus avoid paying tax on it. It was also designed to be temporary through the Redemption Agreement and the Warrant. A reasonable interpretation of the objective facts shows that the donation and the Warrant were interdependent steps. The court will not now entertain the notion that the Warrant should be analyzed as an independent economic feature of the SC2 transaction as employed by plaintiffs. It is also clear that these features were related component parts used to reach the ultimate result of

allocating S&N's income to a tax-exempt entity for a set time with a built-in mechanism for recapturing the donated shares.

Under the Step Transaction Doctrine, plaintiffs' argument that the Warrant deserves independent economic analysis fails. The Luckenbach report fails to raise triable issues of fact.[9]

F.  Dischargeability of the Tax Debt

Plaintiffs' complaint does not seek a ruling from this court on the dischargeability of the underlying tax debt sought by the FTB. Their theory is that any tax debt is owed by S&N and the statute of limitations has run on the FTB's collection from S&N. In addition to arguing that plaintiffs are the correct taxpayers, the FTB's motion for summary judgment spends considerable time discussing why the tax debt is not dischargeable and was not discharged in plaintiffs' Chapter 7 case. Because it appears that plaintiffs concede that the tax debt is nondischargeable, the court will not spend significant time on this issue.

The FTB's first nondischargeability theory relies on Bankruptcy Code §523(a)(1)(B). As a general matter, the FTB's tax treatment follows the IRS's treatment. To that end, Cal. Rev. & Tax. Code §18622(a), provides that a taxpayer "shall report" final federal determinations of changes or corrections. In April 2008,

---

[9] The duty of consistency also estops plaintiffs from claiming that S&N is the entity that owes this tax debt.

the IRS issued its Notices of Deficiency. The FTB claims plaintiffs never reported these 2008 IRS changes to the FTB. Bankruptcy Code §523(a)(1)(B)(i) provides that a chapter 7 discharge does not discharge an individual debtor from any debt with respect to which a return or equivalent report or notice, if required, was not filed or given.

The FTB contends that the report plaintiffs were required to make to the FTB is, for purposes of Bankruptcy Code §523(a)(1)(B)(i), an "equivalent report or notice" which plaintiffs failed to give. The FTB relies on State of Maryland v. Ciotti (In re Ciotti), 638 F.3d 276 (4th Cir. 2011). Ciotti involved Maryland statutes which are substantially the same as California's and the Ciotti court's reasoning is persuasive and this court will follow it.

In the alternative, the FTB also argues that the tax debt is not discharged under Bankruptcy Code §523(a)(1)(A). Pursuant to Bankruptcy Code §523(a)(1)(A), a chapter 7 discharge does not discharge an individual debtor from any debt for a tax of the kind and for the periods specified in Bankruptcy Code §507(a)(8). Section 507(a)(8) defines three alternative grounds for finding tax debt nondischargeable. Section 507(a)(8)(A)(iii) provides that unsecured claims of governmental units whose claims are for a tax measured by income for a taxable year ending on or before the date of the filing of the petition, not assessed before, but assessable,

under applicable law or by agreement, after, the commencement of the case are not dischargeable.

Each of these elements is present here. The FTB is a governmental unit as defined in Bankruptcy Code §101(27) and plaintiffs' tax debt is based on reallocation of income from LAPF to S&N and passed through to plaintiffs. The tax years in question are 2001-2004 and plaintiffs' chapter 7 case was filed in August 2009. The FTB issued its Notices of Proposed Assessments on October 8, 2010. *Allair Dec. Ex. D.* This was not before the August 2009 petition date. The FTB issued its Notices of Action on February 20, 2018. *Allair Dec. Ex. G.* These did not become final until March 22, 2018. <u>See</u> Cal. Rev. & Tax. Code §19045(a) (action upon taxpayer's protest is final upon expiration of 30 days from the date the FTB mails notice of its action to taxpayer unless taxpayer appeals within that 30-day period.)

Finally, the taxes were *assessable after* the August 2009 petition date. Cal. Rev. & Tax. Code §19755(a)(1) provides that "with respect to proposed deficiency assessments related to an abusive tax avoidance transaction, a notice of a proposed deficiency assessment may be mailed to the taxpayer within *eight* years after the return was filed." The FTB was reviewing plaintiffs tax returns in connection with their participation in the SC2 transaction which the FTB viewed as an abusive tax avoidance transaction. The deadline for the FTB to issue its Notices of

Case: 18-04061    Doc# 41    Filed: 10/29/19    Entered: 10/29/19 13:57:06    Page 35 of
40

Proposed Assessments for the tax years 2001-2004 was eight years after the returns were filed in each of these years.

Plaintiffs returns were filed on October 15 in 2002, 2003, 2004, and 2005. *Allair Dec. Ex. F*. The FTB served its Notices of Proposed Assessments for each tax year on October 8, 2010. *Allair Dec. Ex. D.* Accordingly, these Notices were issued within eight years of the respective return dates and the taxes were still assessable *after* the August 2009 petition date. Accordingly, the tax debt owed to the FTB is the kind and for the periods specified in Bankruptcy Code §507(a)(8) and is not discharged. The interest on the tax debt is also not dischargeable. See <u>State of Florida Dept. of Revenue v. Diaz (In re Diaz)</u>, 647 F.3d 1073, 1090 (11th Cir. 2011) (pre- and post-petition interest on nondischargeable debt is not discharged).

G.    <u>Dischargeability of the Tax Penalties</u>

The FTB assessed $495,222.09 in IB Penalties under Cal. Rev. & Tax. Code §19777. *Allair Dec., Ex. G*. The second claim for relief in plaintiffs' complaint refers to Bankruptcy Code §523(a)(1)(A) and alleges that these penalties were "imposed with respect to a *transaction or event* that occurred *before three years before* the date of the filing of the petition commencing the within chapter 7 case" and are therefore discharged. *Complaint, ¶21-24.* Without referring to it, the complaint is premised on Bankruptcy Code §523(a)(7)(B). This section provides that a penalty payable to a

governmental unit imposed with respect to a "transaction or event that occurred *before three years before*" the date of the petition is dischargeable.

The parties disagree on the relevant "transaction or event" date. The FTB contends it is the date it mailed the Notices of Proposed Assessment on October 8, 2010, which was not "before three years before" the August 2009 petition date. *Allair Dec., Ex. D.* The FTB relies on King v. Franchise Tax Board (In re King), 961 F.2d 1423 (9th Cir. 1992). In King, the Ninth Circuit held that "it is common sense that a tax assessment, as a formal act with significant consequences, cannot occur before it is final. In California, this final date is no less than 60 days after the issuance of the notice of proposed additional tax." Id. at 1427. (Because of plaintiffs' protest, the tax assessments were not final until at least 2018 when the FTB issued its Notices of Action.)

Plaintiffs contend that the relevant "transaction or event" date is the "existence of a deficiency attributable to an abusive tax avoidance transaction" because that is the language used in Cal. Rev. & Tax. Code §19777. Plaintiffs contend these deficiencies occurred in 2002 to 2005 when their returns were due – well before three years before the 2009 petition date. Therefore, the IB Penalties were discharged. Plaintiffs rely on McKay v. United States, 957 F.2d 689, 693 (9th Cir. 1992) in which the court stated that "a penalty imposed on unpaid taxes accruing more than three

years before the filing of the bankruptcy petition is dischargeable." But this broad statement warrants closer scrutiny.

McKay involved a taxpayer who had timely filed and paid his income taxes for 1971-1974 and then sued for a refund in 1976. The IRS issued a notice of deficiency in 1977 for tax years 1972 and 1973. The taxpayer was convicted of tax fraud in 1979. The IRS filed a counterclaim in the refund suit in 1981. At some point thereafter, the taxpayer filed bankruptcy and obtained a discharge in 1987. In 1990, the district court entered a judgment for the IRS in the refund suit and held that the tax debt, including penalties, was not discharged because taxpayer had filed fraudulent returns. On appeal, the taxpayer argued that the civil fraud penalties *levied* in 1977 were dischargeable and were discharged under §523(a)(7)(B) because they predated his bankruptcy by more than three years. The Ninth Circuit agreed. While the facts are somewhat cryptic in McKay, the relevant transaction date used by Ninth Circuit was the date the deficiency was assessed in 1977. Thus, McKay does not support plaintiffs' argument that the relevant date is the date the returns were due.

Based on the above, the IB Penalties do not come within the ambit of Bankruptcy Code §523(a)(7)(B) because they were not imposed with respect to a transaction or event that occurred before three years before the date of the filing of plaintiffs' bankruptcy

petition. Therefore, they were not discharged. Summary judgment for the FTB on this issue is appropriate.

**V.   Conclusion**

For the foregoing reasons, the court grants summary judgment for the FTB. Counsel for the FTB is requested to submit an order and a judgment conforming to the above.

***** End of Memorandum Decision *****

**Court Service List**

No service required.